[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 911 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 912 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 913 
 On Application for Rehearing
The opinion of May 10, 1996, is withdrawn and the following is substituted therefor.
Nathan Slaton was indicted and convicted of the capital murder of Modenia Phillips. The murder was made a capital offense because it was committed during the course of a rape. See Ala. Code 1975, § 13A-5-40(a)(3). The murder occurred on May 28, 1987. Slaton was 17 years old at the time of the offense but, upon motion of the State, was tried as an adult.
Voir dire examination of the prospective jurors began on April 2, 1990, and lasted for three days. Trial began on April 5 and lasted until April 11. The jury found Slaton guilty on April 11. The sentencing phase of the trial began April 12. The jury recommended that Slaton receive the death penalty. After hearing arguments and testimony, the trial court on May 22, 1990, sentenced Slaton to death by electrocution. Slaton appealed to the Court of Criminal Appeals, which remanded the case on two issues: pretrial excusal of veniremembers by the trial judge's secretary, and the trial court's consideration of Slaton's New York juvenile adjudication. Slaton v. State,680 So.2d 877 (Ala.Crim.App. 1993). On return from remand, the Court of Criminal Appeals affirmed the conviction and sentence on January 13, 1995. Slaton v. State, 680 So.2d 879
(Ala.Crim.App. 1995). It subsequently denied Slaton's application for rehearing. Slaton raises 25 issues on this certiorari review. We address 18 of those issues and adopt the holding of the Court of Criminal Appeals as to the remaining issues.
 Issue 1
Did the court's instruction to the jury at the guilt phase of the trial violate Slaton's rights under the Fifth, Sixth,Eighth, and Fourteenth Amendments to the United States Constitution? From a careful reading of the record, we conclude that the instruction was designed to explain to the jury why the entire statement given by Slaton to the police was not before them as evidence. Slaton argues that it is improper for the court to give an instruction that informs the jury that there was evidence the prosecution would have presented, but for evidentiary rules that prevented it from doing so. The instruction stated as follows:
 "The defendant's statement herein was not admitted nor offered in bulk because there were some inadmissible matters contained in the statement that could not come before you for your consideration. The reason that it was not offered or admitted in bulk was for that reason."
(R.T. 2101.)
The trial court's jury charge was simply an explanation to the jury as to why the statement was not going to be admitted into evidence. It served to clarify to the jury why it had not heard the whole statement. The trial court's jury instruction was not erroneous. Dooley v. State, 575 So.2d 1191, 1194
(Ala.Crim.App. 1990); Thompson v. State, 503 So.2d 871, 879
(Ala.Crim.App. 1986).
 Issue 2
Was evidence regarding Slaton's statement improperly admitted? Slaton claims he invoked his Miranda right to remain silent and that the police made implied promises to him. Slaton was arrested by the Albertville police and taken to the Albertville police station, where he made a taped statement. Slaton contends that while being interrogated, he invoked his right to remain silent and that his invocation of that right was ignored by the Albertville police. Slaton made this statement to the police: "Oh God, I don't feel like going through all this." Slaton claims that statement meant that he did not want to continue the questioning and was invoking his right to remain silent. *Page 914 
Slaton did not clearly assert — and gave no indication — that he was invoking his right to remain silent. In Miranda v.Arizona, 384 U.S. 436, at 476-79, 86 S.Ct. 1602, at 1628-31,16 L.Ed.2d 694 (1966), the United States Supreme Court held that the police must give certain warnings before they can question a person under arrest. Statements made by an arrested person who has not received the warnings are inadmissible in court. One of the rights established in Miranda was the suspect's right to end questioning at any time. 384 U.S. at 474,86 S.Ct. at 1627-28. "Once informed of Miranda rights, an accused has the burden of indicating in some manner his wish to remain silent." Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346
(1988); United States v. Alegria, 721 F.2d 758 (11th Cir. 1983). In Lightbourne,
 "Investigator LaTorre advised [the defendant] of his Miranda rights and questioned him after [the defendant] responded that he understood these rights and 'had nothing to hide.' At some point during the interview, [the defendant] asked whether he had to continue with the interrogation. LaTorre asked [the defendant] what he meant by that question and whether he wanted to take a break. At that point, and apparently without elaboration or indication that [the defendant] desired a respite, [the defendant] continued the conversation."
829 F.2d at 1017. The Eleventh Circuit Court of Appeals held that a defendant "who asked during interrogation whether he had to continue with [the] interrogation[,]" was not coerced into continuing the interrogation. Lightbourne, 829 F.2d at 1017-19.
Context determines the meaning of Slaton's statement. That statement is found on page 29 of the second supplemental record. Slaton was describing in chronological order what he claimed had happened at the victim's house on the day of the murder. Slaton told police that the victim forced him at gunpoint into her bedroom. Slaton claims the victim then accused him of breaking into her house and asked him if he had a girlfriend. The police officer taking Slaton's statement then asked him: "Then what happened?" Slaton then stated, "Oh, God, I don't feel like going through all this." Slaton's next statements described the victim forcing Slaton, at gunpoint, to have sex with her. There is no reason to think Slaton was asking that the questioning be stopped. Slaton was, in essence, saying he did not like talking about the sexual details of what he says happened next. The context indicates that he was not ambiguously or equivocally asserting his right to remain silent. The Court of Criminal Appeals correctly rejected Slaton's claim that his Miranda rights were violated.
Slaton also claims on this certiorari review, for the first time, that his statement was induced by an implied promise. The detectives told him they wanted to hear his side of the story, saying, "We'd love for you to tell us your side of the story." Slaton claims that this statement by the police officers contained an implied promise. Slaton argues that the police implied by this statement that they were his allies. Slaton contends that this implication by the police meant that his assisting them could, in turn, benefit him. Slaton claims this was his understanding and that he was manipulated by this statement. There is simply no improper inducement in a police officer's saying that he or she wants to hear a suspect's story. Slaton's claim is without merit.
 Issue 3
Did the trial court commit reversible error when it failed to instruct the jury that it could reject Slaton's confession if it was not made voluntarily? The trial court instructed the jury: "[You] shall consider the circumstances under which the alleged statement was obtained and the appliances [sic] by which it was supposedly elicited, including the situation and mutual relations of the parties." (R.T.2099.) The trial court did not tell the jury that it had already determined the statement was made voluntarily; such a statement is proscribed by Ex parte Singleton, 465 So.2d 443 (Ala. 1985). The instruction was not erroneous. *Page 915 
 Issue 4
Did the trial court err in admitting testimony based on a transcript of an unauthenticated tape recording of Slaton's confession? At trial, one of the detectives who questioned Slaton on the night of his arrest testified as to Slaton's statement. The officer, Detective Edsel Whitten, testified from his memory, part of his recollection being refreshed by a transcript of the recording. Neither the tape nor the transcript was offered into evidence, nor was the tape authenticated. Slaton contends that because the tape was never authenticated the testimony based on a memory refreshed by the transcript was not properly admitted into evidence. InUnited States v. Scott, 701 F.2d 1340 (11th Cir. 1983), the Eleventh Circuit Court of Appeals wrote:
 "[T]he Government elicited through certain witnesses' testimony the pertinent information contained in the inadmissible documents. In doing so, the witnesses were allowed by the trial court to use the applications to refresh their recollection.
 "Under Fed.R.Evid. 612, refreshing one's recollection is permitted. The trial court carefully instructed the witnesses that they were permitted to testify only as to what they independently remembered."
701 F.2d at 1346. The Court of Criminal Appeals, in Walker v.State, 445 So.2d 955 (Ala.Crim.App. 1983), also stated:
 ". . . C. Gamble, McElroy's Alabama Evidence § 116.02(6) (3d ed. 1977), says 'A witness may refer to a writing for the purpose of refreshing his recollection without first, as a condition precedent, having shown that it is necessary for his recollection to be refreshed.' "
445 So.2d at 957.
The transcript was authenticated by Detective Tommy Cole, and Detective Whitten used the transcript to refresh his recollection. Neither the tape recording, nor the transcript of that recording or any portion of that transcript, was ever offered or admitted into evidence at Slaton's trial. While looking at the transcript, Officer Whitten was asked questions such as "What did Slaton say?" or "What did the witness say?" There was no error in allowing Detective Whitten's testimony.Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App. 1990), affirmed, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Ex parte Taylor,666 So.2d 73 (Ala. 1995).
 Issue 5
Did the prosecutor improperly comment on Slaton's failure to testify? Slaton contends that the prosecutor's closing argument contained a comment on his failure to testify and thus violated his constitutional right to remain silent.
The prosecutor's comment was: "But what evidence is there, ladies and gentlemen, that on May 28, 1987, between 9:00 and 9:30 in the morning that Nathan Slaton had one of those explosions?" This question was asked in the context of the prosecutor's discussion of Slaton's insanity defense. Slaton had produced expert testimony that he might be suffering from an "explosive disorder" that caused him to become uncontrollably violent at times. However, Alabama law holds that if there is testimony that a defendant suffers from a mental disease or defect but also has lucid periods, then the crime is presumed to have been committed during a lucid period. In rebutting this defense, the prosecution referred to the failure of the defense to offer any evidence that the murder occurred during an explosive period. Hardy v. State,462 So.2d 1016, 1017 (Ala.Crim.App. 1984). Slaton's claim is without merit.
 Issue 6
Slaton contends that the trial court committed reversible error by allowing two expert witnesses for the State, Dr. Wilburn Rivenbark and Dr. Kmal Nagi, to testify as to their opinions of Slaton's mental condition based on hospital records that were not admitted into evidence. Slaton says this violated the Alabama rule that the information an expert relies upon must be in evidence.
Slaton argues that Dr. Rivenbark improperly testified regarding the administration of the Millon Clinical Multiaxial Inventory, or MCMI. Dr. Rivenbark testified that the *Page 916 
MCMI was an objective test, i.e., that it contained objective questions that required true or false answers. Dr. Rivenbark testified that scales used for the MCMI test would reveal whether the person taking the test had answered carelessly or had attempted to deny or exaggerate his answers or problems. Slaton took the test. Dr. Rivenbark personally graded and determined the results of Slaton's test. Dr. Rivenbark stated that the indicators of Slaton's test showed that he did not answer it carelessly or untruthfully. Dr. Rivenbark was not relying on the opinions of others. Dr. Rivenbark testified as to his personal administration and grading of the test. This was sufficient to substitute for the admission of the test results.
Dr. Nagi testified that he partially relied on Dr. Rivenbark's administration of the MCMI test. Dr. Rivenbark's testimony concerning the test was already in evidence at that time. Dr. Nagi relied on several factors in reaching his diagnosis. Those factors included a social history of Slaton and a personal interview with Slaton; Slaton's behavior during hospitalization, as recorded by a team of people working with Dr. Nagi, including a social worker, a therapist, a psychologist, a nurse, and a psychiatrist; and psychological testing. Thus, his opinion was based only in small part on the opinion of Dr. Rivenbark. The only item Dr. Nagi based his opinion on that was not introduced into evidence was the MCMI test. However, because Dr. Rivenbark described how he administered the test, explained the test, and explained the result of the test, all the facts about the test were in evidence. Because all the facts were in evidence, Dr. Nagi's testimony was entirely proper. The leading case on this question is Nash v. Cosby, 574 So.2d 700 (Ala. 1990), which allowed a medical expert to give his opinion based in part on the opinions of others, even though those opinions were not in evidence:
 "This trend recognizes that because of a growing tendency toward division of services in the medical field, any person who undertakes to make a diagnosis must necessarily rely on the opinions and tests of other persons. Records that are sufficient to support a diagnosis in a hospital should be sufficient to form the basis for expert testimony in the courtroom."
574 So.2d at 704. Further, Dr. Nagi did not actually rely on the medical opinion of Dr. Rivenbark. Dr. Nagi relied on the objective results of the MCMI test. Dr. Rivenbark had testified regarding the psychological test before Dr. Nagi testified. Therefore, the information was already in evidence and could serve as a proper basis for Dr. Nagi's opinion testimony. Dr. Nagi also testified as to the facts he gathered from his interview with Slaton. The facts from the personal interview and the social history were in evidence and could properly serve as a basis for Dr. Nagi's opinion testimony.
 Issue 7
Slaton claims the prosecutor made improper arguments during the closing of the guilt phase. Slaton claims that during rebuttal the prosecutor misstated the evidence on a number of matters, most importantly those relating to the testimony of two doctors called by the defense, as their testimony related to their diagnosis of Slaton as having a mental disorder called "intermittent explosive disorder" and as it related to their method of diagnosing the disorder. Slaton contends that the prosecutor failed to distinguish between a preliminary diagnosis and a final diagnosis made by the St. Lawrence Psychiatric Center and contends that the prosecutor misrepresented evidence relating to how the final diagnosis was reached. Slaton's attorney objected at the end of the prosecutor's closing argument, but refused a curative instruction. Slaton makes five claims about the prosecutor's statement regarding the expert testimony.
First, Slaton claims that the following argument was improper because, he says, it misstated the evidence:
 "The defense has the burden of showing you that Nathan Slaton was having such a mental disease or defect at the time of the commission of this crime. Now they place great weight and argue great weight on behalf of their doctors. They tell you that the doctors in Tuscaloosa made a preliminary finding and stuck with it like all the *Page 917 
way through. I wonder what happened up in St. Lawrence [Psychiatric Center]? Did they do the same thing? They tell you that the doctors in Tuscaloosa didn't have a complete history. Why, they didn't even consider the St. Lawrence records in making their diagnosis. Look at these records right here when you go to the jury room. And let me ask you where there is anything in these records that you can find before October 11th, 1985, which is the date of admission of Nathan Slaton to this facility? Did they use records from somewhere else to make their consideration and diagnosis? I think you'll look at these and say the answer is no. Why should Taylor Hardin be any different? Dr. Nagi was very insistent on the fact that 'I don't use other doctor's records.' In other words, 'I'm not just going to rubber stamp what another doctor is saying. I'm going to make the diagnosis myself.' And I admire him and appreciate him for that very fact. This is a thick record, and I don't know if you'll be able to study it or will study it in depth back there in the jury room, but right here on this page on the document that is dated 10/11/85, that's the date of admission of Nathan Slaton to the psychiatric center, there is the diagnosis, 'intermittent explosive disorder,' signed 'Mr. Murray,' signed, 'Dr. Huessy.' The day he was admitted into that center, they made a diagnosis that he had this condition. Mr. Murray testified to us that in part the diagnosis of intermittent explosive disorder was based upon the abnormal EEG. You'll find in these records, this page right here, a report of the abnormal EEG (indicating). We talked about a dysrhythmic problem. It says down here the EEG is slightly dysrhythmic. It says there is no evidence of focal abnormality or epileptic activity. This is the EEG that you've been hearing about, and it was given October the 17th. Think about it. Six days after Mr. Murray and Dr. Huessy make their diagnosis of intermittent explosive disorder, the one that Mr. Murray says was based in part on a test that hadn't even been run until six days later. This is what you're talking about when you're talking about giving credence to the testimony of these people."
(R.T. 2049-52.)
Slaton claims that the prosecution misstated the evidence in two ways: (1) By asserting that Mr. Murray and Dr. Huessy (the two individuals at St. Lawrence Psychiatric Center who diagnosed Slaton as having intermittent explosive disorder) had lied — arguing that they said they based their diagnosis on a test that had not been conducted at the time they reached their diagnosis, and (2) by asserting that Slaton was diagnosed with finality on the day he was admitted to the St. Lawrence Psychiatric Center.
The prosecutor did not assert that Slaton's experts lied and he did not assert that Slaton was "diagnosed with finality" on the day he was admitted. He drew legitimate inferences from the evidence presented and urged the jury to do the same.Kuenzel v. State, 577 So.2d at 493-94.
Slaton's second claim as to the prosecutor's closing statements about Slaton's expert witnesses is that the prosecutor distorted the evidence when he said St. Lawrence Psychiatric Center made a diagnosis on the first day. The record does show that the experts at St. Lawrence Psychiatric Center made a diagnosis on the first day of Slaton's admission. The fact that the final diagnosis was made after further evaluation does not make the prosecutor's comment a misstatement of the facts.
Slaton's third claim is that the previous two comments, when coupled with the prosecutor's statement about the crime and with the photographs of the crime scene and the victim's body, resulted in a misstatement of the evidence. This claim is invalid. There is nothing improper with the prosecutor's reference to the evidence and his urging the jury to reject Slaton's defense based on a claim of mental disease or defect.Darden v. Wainwright, 477 U.S. 168, 185, 106 S.Ct. 2464,2473-74, 91 L.Ed.2d 144 (1986).
Slaton's fourth claim is that the prosecutor's statement that Slaton did not receive medication while in jail and did not seem to be manifesting seizures was not *Page 918 
based on the evidence introduced at trial. Slaton failed to object at first, but later objected and then refused a curative instruction. Slaton was inviting error. Because of Slaton's own invitation of error, he cannot now complain that he had a fundamentally unfair trial. Johnson v. State, 507 So.2d 1337,1344 (Ala.Crim.App. 1985).
Slaton's fifth claim is that the prosecution wrongly used Dr. Nagi's testimony to support an assertion that intermittent explosive disorder will not appear in future editions of DSM-IV, a standard test administered in the diagnostic care of mental patients. Dr. Nagi testified that intermittent explosive disorder was a very rare disorder, so rare that experts who prepared DSM-IV were thinking of deleting that diagnosis from the latest edition of DSM-IV. The prosecutor, at most, overstated Dr. Nagi's testimony, but the overstatement was so slight as to be trivial. Even if the statement was error, it was not prejudicial error.
Slaton also claims that the cumulative effect of all of these comments by the prosecutor about his defense of mental disease or defect mandate reversal. However, Slaton has failed to demonstrate that his claims are any stronger when considered cumulatively. The prosecutor did not misstate the evidence, nor did he use improper argument. Gray v. State, 568 So.2d 381, 384
(Ala.Crim.App. 1990).
 Issue 8
Slaton claims that the State failed to prove the chain of custody for certain critical pieces of evidence. Slaton contends that the State failed to meet its burden of establishing the chain of custody for the victim's vaginal swab and blood samples and Slaton's saliva sample. Slaton claims there is a missing link, not a weak link, in the chain of custody for these items because there was no testimony concerning the transportation of the victim's body. He also contends that there is a missing link in the chain of custody of the Slaton saliva sample because the testimony about how the sample was delivered to the laboratory is in conflict. Detective Cole testified that he delivered the sample in an envelope to the Department of Forensic Sciences. Slaton claims that the person at the Department of Forensic Sciences who received the sample testified that the sample was in two clear plastic vials when he received it. Slaton claims that this conflict indicates that there must have been another link in the chain of custody. Detective Cole testified that the saliva evidence was transferred in the same condition to Brent Wheeler at the Department of Forensic Sciences lab at Huntsville. (R.T. 1354.)
Ex parte Holton, 590 So.2d 918 (Ala. 1991), sets forth the legal analysis to be applied in determining if a proper chain of custody has been established:
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."
590 So.2d at 920. While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State,650 So.2d 603 (Ala.Crim.App. 1994). *Page 919 
There had been a case law conflict on chain of custody that was settled in January 1996 by this Court. In Ex parte Garrett,608 So.2d 337 (Ala. 1992), this Court had held that a lack of direct testimony as to a link in the chain of custody was a missing link, not a weak link. However, this conflict was recently settled in Kennedy v. State, [Ms. 1941731, January 26, 1996] ___ So.2d ___ (Ala. 1996). In Kennedy, this Court reaffirmed the chain-of-custody rule from Holton and overruled the chain-of-custody rule stated in Garrett.
Dr. Joseph Embry testified that he made swabs of the vagina and made smears of the contents. He packaged these items in the rape kit, sealed it, and placed his initials across the seal. He said he turned this over to the contract driver. The contract driver, Bruce Sparling, testified that he received these items from Dr. Embry, kept them in the same condition, and turned them over personally to Roger Morrison, who conducted the tests on the items.
Detective Cole testified that at the conclusion of Slaton's statement, Slaton was asked to give samples of hair, blood, and saliva. Slaton gave them voluntarily. Slaton removed the head hairs and pubic hairs personally, and they were put in separate envelopes, which Cole sealed and initialed. Then Slaton gave a saliva sample. Cole testified that the gauze used in taking the sample was in a small square package. He said that he opened the package and that "[h]e [Slaton] was given some gauze to chew and he chewed it and spit it in the little container." (R.T. 1305.) Slaton then put the sample into an envelope. Detective Cole testified that he left the hair and saliva samples in his evidence locker and that when he later retrieved them they were in the same condition as when he took them from Slaton.
A blood sample was also taken from Slaton at the hospital. Detectives Whitten and Cole observed the taking of that sample and, immediately upon its being drawn from Slaton, it was turned over to Detective Whitten in the presence of Detective Cole.
All the samples were taken from Slaton in the room where he was questioned, except for the blood. Detective Whitten's testimony supported everything Detective Cole testified to about Slaton's samples. Whitten put the blood sample in the refrigerator until he transported it to the lab. He placed the seal on the evidence package, placed his identification on it, and turned it over to Brent Wheeler.
Brent Wheeler of the Alabama Department of Forensic Sciences testified that he received "a manila envelope containing head hair identified as having been taken from Nathan Slaton, a sealed envelope containing pubic hair from the same individual, two sealed plastic bottles identified as containing saliva from the same individual, two red-topped tubes identified [as] containing blood from the same individual." (R.T. 1414-15.) He further testified that he turned these items over to Mr. Morrison, the serologist who conducted the tests. There is testimony establishing each link in the chain of custody. Therefore, the State met the legal standard for establishing chain of custody. There was no evidence presented that the samples in this case had been tampered with. The simple fact that Detective Cole testified that Slaton spit the gauze used to take the saliva sample into a "little container" does not contradict the testimony of Wheeler, who used the term "bottle." Nor does the fact that the containers or bottles were placed in an envelope by Slaton create a conflict in the testimony. Therefore, the evidence does not show that there was a missing link as to the saliva sample.
Therefore, as to the hair, saliva, and blood samples, there is a chain of continuous possession from the time those samples were taken from Slaton until they were received by the expert who tested those items. There was a chain of custody established for each item. Alabama law does not require each link to testify.
In addition, the validity of the results of these tests were verified by other evidence. The result of the blood test did not conflict with the result of the saliva test. In regard to the body of the victim and the semen samples taken with the vagina swabs, Slaton admits he had sex with the victim. It is obvious that the State overwhelmingly *Page 920 
proved the corpus delicti in this case independent of Slaton's statement, and there was no evidence of any tampering with the evidence. Slaton is not entitled to any type of relief based on his chain-of-custody claims.
 Issue 9
Did the jury instruction regarding reasonable doubt in both the guilt phase and the penalty phase violate the Eighth andFourteenth Amendments? Slaton maintains that the trial court's charge to the jury at the guilt phase, stating that reasonable doubt is properly equated with "substantial doubt" and that the jury must be convinced of Slaton's guilt beyond a reasonable doubt and "to a moral certainty," was improper and reversible error under the Due Process Clause. He argues that such an instruction might allow a conviction based on a lower standard than that allowed by the United States Constitution. Slaton makes the same arguments regarding the terms "substantial doubt" and "moral certainty" as they were used in the instructions given at the penalty phase.
In Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239,127 L.Ed.2d 583 (1994), the United States Supreme Court held that jury instructions on reasonable doubt that incorporated the terms "moral certainty," "abiding conviction," and "substantial doubt," did not lower the standard for determining what the term "guilt beyond a reasonable doubt" means. We conclude that there was no error in the trial court's instructions to the jury for determining guilt beyond a reasonable doubt.
Slaton also claims that the trial court's jury instruction on reasonable doubt given at the sentencing stage of his trial was improper under the United States Supreme Court's ruling inCage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339
(1990). In Cage, the United States Supreme Court determined that reasonable doubt instructions equating reasonable doubt with "a grave uncertainty" violated the due process rights of the defendant. 498 U.S. at 40, 111 S.Ct. at 329. The United States Supreme Court in Victor, supra, clarified its decision in Cage. The question is not whether the instruction "could have" been applied constitutionally, but whether there is a reasonable likelihood that the jury did so apply the instruction. Victor, 511 U.S. at ___ _ ___,114 S.Ct. at 1242-43. The trial judge in Slaton's case instructed the jury that it had to find aggravating circumstances to exist beyond a reasonable doubt in order to recommend the death penalty. He also reminded the jury of the instructions he had given during the guilt phase concerning the basic law in defining the terms "reasonable doubt" and "moral certainty." The trial judge instructed the jury to apply at the sentencing stage his previous instructions on reasonable doubt, which were:
 "The State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.
 "The term "reasonable doubt" has been used throughout the charge and throughout the case and argument of counsel. As I have told you, the burden of proof is upon the State of Alabama to prove beyond reasonable doubt that the defendant is guilty of the offense charged. That phrase, reasonable doubt, is somewhat self-explanatory and efforts to define it do not always clarify the term. But it may help you some to say that a doubt which would justify an acquittal must be an actual and substantial doubt and not a mere possible doubt. A reasonable doubt is not a mere guess or surmise and it is not a forced or captious doubt.
 "If after considering all of the evidence in the case, you have an abiding conviction [in] the truth of the charge then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from the evidence and remaining after a careful consideration of the testimony such as reasonable fair minded and conscientious men and women would entertain under all the circumstances.
 "Now, you will observe that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply *Page 921 
beyond a reasonable doubt and to a moral certainty. If, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say you have an abiding conviction to a moral certainty of the defendant's guilt, then you are not convinced beyond a reasonable doubt and the defendant would be entitled to an acquittal."
(R.T. 2079-81.) After reviewing the trial court's instructions at the sentencing stage in their entirety, we determine that they did not violate the principles expressed inVictor.
 Issue 10
Slaton claims the trial court erred in instructing the jury that it could find evidence unworthy of credit only if it was unable to reasonably reconcile all the evidence. Slaton contends that this instruction was tantamount to telling the jury that there is a presumption that all the testimony it heard was true. He says this violates state law. The instruction was not tantamount to telling the jury that there is a presumption that all the testimony is true. Instead, the instruction tells the jury to weigh and reconcile all the testimony it heard.
The trial judge instructed the jury:
 "You should weigh all the evidence and reconcile it if you can reasonably do so, but, if there is a conflict in the evidence which is not capable of reconciliation, you ought to take that evidence which you think is worthy of credit and give it just such weight as you think it is entitled to receive. In doing so, you may take into consideration any interest which any witness might have been shown to have in the outcome of the case. If you believe that any material part of the evidence of any witness was willfully false, you may disregard all of the testimony of such witness."
(R.T. 2098.)
However, the trial judge did not, as Slaton seems to claim, charge the jury that witnesses were presumed to tell the truth. The instruction merely tells the jury that it should weigh all of the evidence and reconcile it, if it reasonably could do so, but that if there was a conflict in the evidence that was not capable of reconciliation, it ought to take that evidence which it thought was worthy of credit and give it such weight as it thought the evidence was entitled to receive. Furthermore, Slaton ignores other relevant portions of the trial court's charge as to determining the credibility of the evidence. The trial court charged the jury that it could take into consideration "any interest which any witness might have shown" and that if the jury believed "that any material part of the evidence of any witness was willfully false, it could disregard all the testimony of such witness." There was no error in the trial court's charge to the jury concerning testimony and evidence. Knotts v. State, [Ms. CR-92-0462, June 16, 1995] ___ So.2d ___ (Ala.Crim.App. 1995).
 Issue 11
Slaton claims the jury instruction regarding the presumption of innocence violated his Fifth, Sixth, Eighth, andFourteenth Amendment rights. The jury was instructed on the presumption of innocence and was told that Slaton was to be presumed innocent during its deliberations. Slaton claims the jury instructions were defective because the jury was also told to assign such weight to each piece of evidence as it thought the evidence should receive; he says the jury was left to assign whatever weight it wanted to the presumption of innocence. He claims this violated his constitutional rights.
The trial court instructed the jury:
 "In coming before you, a jury of his peers, upon his plea of not guilty and not guilty by reason of mental disease or defect, the defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberation on the verdict and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty. The presumption of innocence with which the defendant enters into a trial is a fact in the case which must be considered with all the other evidence and is not to be disregarded by you."
(R.T. 2078-79.)
The second instruction cited by Slaton was: *Page 922 
 "You should weigh all the evidence and reconcile it if you can reasonably do so, but, if there is a conflict in the evidence which is not capable of reconciliation, you ought to take that evidence which you think is worthy of credit and give it just such weight as you think it is entitled to receive. In doing so, you may take into consideration any interest which any witness might have been shown to have in the outcome of the case. If you believe that any material part of the evidence of any witness was willfully false, you may disregard all of the testimony of such witness."
(R.T. 2098.)
Slaton claims the jury's guilty verdict shows that the jury "must have perceived a conflict between various pieces of the State's evidence and the presumption of innocence since it determined that Mr. Slaton was guilty." According to Slaton, since the jury was instructed to assign to each piece of evidence "just such weight as you think it is entitled to receive," the jury must have assigned some weight to the presumption of innocence.
The instructions cited by Slaton were not given in conjunction with each other. The jury was clearly instructed that Slaton had a presumption of innocence that was to stay with him throughout the trial and that the State had the burden of proving his guilt beyond a reasonable doubt. Slaton is attempting to twist what the trial court said, so as to argue that the jury might have misunderstood the instructions on evidence and thought that those charges applied to the presumption of innocence. Slaton's basis for this claim is that the jury found him guilty. Slaton's reasoning would invalidate all guilty verdicts, an absurd proposition. What the verdict shows is that the jury concluded that the State had met its burden of proving Slaton's guilt beyond a reasonable doubt and had overcome the presumption of innocence.
The trial judge's instructions regarding the presumption of innocence and regarding the evidence were entirely proper.Carroll v. State, 407 So.2d 177 (Ala. 1981). Slaton's claim to the contrary is frivolous.
 Issue 12
Slaton claims that the trial court erred when, while it had the case on remand to reconsider the death sentence, it resentenced Slaton to death. Slaton argues that the error stems from what he alleges to be the trial court's presumption for the death penalty over a sentence of life imprisonment without parole. He also argues that the trial court improperly ignored a statutory mitigating factor. Slaton claims these errors violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.
Slaton's argument is in three parts. First, he argues that the trial court committed preremand error when it failed to take into account the statutory mitigating factor of a lack of a significant criminal history. He argues that the trial court erred in this regard because it considered his juvenile record. The trial court relied on Slaton's juvenile record to find that this mitigating factor was not applicable. The trial court's preremand error was based on the fact that juvenile adjudications are not criminal convictions. The Court of Criminal Appeals remanded the case to the trial court because of this error, and on remand the trial court reimposed the death sentence.
Second, Slaton argues that the trial court committed error on remand by presuming that the correct sentence was death. Slaton claims the law provides a presumption in favor of life and not death, and, therefore, that the alleged presumption by the trial court violated the law. Slaton also claims that the trial court's order erroneously fails to mention the mitigating factor of no significant past criminal history. Third, Slaton argues that there are other mitigating factors, and that those other factors, coupled with the no-significant-criminal-history factor and properly weighed, should have led to a sentence of life without parole, instead of death.
We cannot accept these arguments as a basis for holding that the trial court improperly resentenced Slaton to death. The trial court fully complied with the Court of Criminal Appeals' order on remand, and it applied the mitigating-factors analysis. The court's reweighing of the mitigating factors, taken in *Page 923 
light of the jury's unanimous recommendation of death, suggested that death was the appropriate sentence.
The trial judge stated in his second sentencing order in response to the remand by the Court of Criminal Appeals:
 "[I]t is apparent that the undersigned trial judge did not state correctly, in the sentencing order, the first factor of the mitigating circumstances, i.e., whether the defendant had a significant history of prior criminal activity, which in this matter is obviously in the negative. Conversely the trial court did state 'that the defendant does have a significant juvenile record'; however, it was noted by the court, although unstated, that the presentence report was based on hearsay information of a juvenile record of arrests, not convictions. The circumstances of this offense: murder during the rape of an elderly woman, and the unanimous recommendation of the jury that the death sentence be imposed would have been sufficient for the court to sentence the appellant to death without consideration of his juvenile record."
Furthermore, the existence of aggravating circumstances, the weight given those aggravating circumstances, and the unanimous recommendation of the jury that the death sentence be imposed were enough for the trial court to sentence Slaton to death without any consideration of his juvenile record. The trial court considered the mitigating circumstance of no significant history of prior criminal activity in reweighing the aggravating and mitigating circumstances. We agree with the Court of Criminal Appeals in its rejection of Slaton's arguments regarding Issue 12.
 Issue 13
Slaton claims that in sentencing him to death the trial court failed to consider other mitigating circumstances. Slaton contends that the trial court failed to make specific findings of fact regarding aggravating and mitigating circumstances, as the court is required to do when sentencing someone to death. Slaton claims the trial court should have considered his family background as a mitigating circumstance.
However, the trial court did enter the following:
 "specific findings concerning the existence or non-existence of each aggravating circumstance enumerated in Section 13A-5-49, Code of Alabama:
 "(1) That the capital offense was not committed by the defendant while he was under sentence of imprisonment.
 "(2) That the defendant had not previously been convicted of another capital offense or a felony involving the use or threat of violence to the person.
 "(3) That the capital offense was not committed under circumstances creating a great risk of death to many persons.
 "(4) That the capital offense was committed while the defendant was engaged in the commission of rape.
 "(5) That the capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
 "(6) That the capital offense was not committed for pecuniary gain.
 "(7) That the capital offense was not committed to disrupt or hinder the lawful exercise of any government function or the enforcement of laws.
 "(8) That the capital offense was not especially heinous, atrocious or cruel compared to other capital offenses."
The trial court further wrote in its order:
 "The Court now proceeds to make the following findings concerning the existence or non-existence of the mitigating circumstances enumerated in Section 13A-5-51 or any additional mitigating circumstances offered pursuant to Section 13A-5-52:
 "(1) That the defendant does have a significant juvenile record. [Corrected by the trial judge on remand.]
 "(2) That the capital offense was committed while the defendant was under the influence of extreme emotional disturbance.
 "(3) That the victim was not a participant in the defendant's conduct or consented to it. *Page 924 
 "(4) That the defendant was the principal and sole perpetrator of this capital offense.
 "(5) That the defendant did not act under extreme duress or under the substantial domination of another person.
 "(6) That while the evidence in this case reflects that the defendant may suffer from a rare condition denominated as Intermittent Explosive Disorder and also temporal lobe epilepsy, the evidence is not sufficient to prove that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court takes note that the defendant has been incarcerated since May, 1987, and no evidence has been submitted that the defendant has required any medication, has suffered any seizures or has suffered any episodes of violent and uncontrollable rage.
 "(7) That the defendant was seventeen years old at the time of the crime.
 "In addition to the mitigating circumstances specified in Section 13A-5-51, the Court has considered all aspects of the defendant's character of record and the circumstances of the offense which the defendant has offered as a basis for a sentence of life imprisonment without parole instead of death. The Court finds that the defendant's background and family history has certain mitigating aspects. These have been considered."
(C.R. 240-42).
The trial court, in compliance with Lockett v. Ohio,438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978), and its progeny, permitted Slaton to present all of the mitigating evidence he wanted to present, and the trial court fully considered that evidence in imposing the sentence. The trial court did not err in finding that some of Slaton's alleged mitigation did not mitigate his crime. "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr.App. 1989).
The trial court instructed the jury, pursuant to Slaton's request, on what factors the jury might consider to be mitigating. The trial court gave a number of examples of possible mitigating factors. The trial court then stated that this instruction did not mean the trial court was giving its opinion as to the factual validity or invalidity of these possible mitigating factors. That, the court said, was for the jury to decide. (R.T. 2289-93.)
Trial judges are presumed to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions. Ex parte Harrell, 470 So.2d 1309, 1318
(Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269,88 L.Ed.2d 276 (1985). The trial court specifically stated in its sentencing order that it had considered all of the mitigation evidence offered by Slaton. (C.R. 242.)
Slaton contends that because the trial judge did not list in his sentencing order all the nonstatutory items Slaton offered as mitigation, that means he failed to consider all of Slaton's nonstatutory mitigation. There is no requirement that a trial court list in its sentencing order all nonstatutory mitigation offered. See Ex parte Haney, 603 So.2d 412, 417-19 (Ala. 1992). Slaton's claim that the trial court failed to consider his nonstatutory mitigating evidence is not supported by the record. The trial court clearly considered all the mitigation Slaton offered.
 Issue 14
Was there insufficient corroboration to admit Slaton's statement into evidence? Slaton argues that when offering a defendant's statement for admission into evidence, the prosecution must also submit corroborating evidence independent of the statement. Slaton argues that there was insufficient corroboration to justify the admission of his statement and, therefore, that the statement should not have been admitted.
Alabama law does not require the presentation of substantial independent evidence establishing the trustworthiness of a statement before that statement is admissible in trial against a defendant. The rule of law in Alabama is that a confession is not *Page 925 
admissible unless there is independent evidence tending to prove the corpus delicti of the offense. Spear v. State,508 So.2d 306, 308-09 (Ala.Crim.App. 1987).
There are only two elements in the corpus delicti of an offense: (1) That a certain result has been produced, and (2) that a person is criminally responsible for that result.Spear v. State, 508 So.2d at 308; Johnson v. State,473 So.2d 607, 608 (Ala.Crim.App. 1985). The evidence clearly showed that the victim was murdered and that Slaton was the murderer.
To support his claim, Slaton cites Opper v. United States,348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). However, the ruling in Opper applies only to federal cases. Even if that were not the case, we would conclude that Opper does not support Slaton. The United States Supreme Court held in Opper:
 "[W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement."
348 U.S. at 93, 75 S.Ct. at 164. There was "substantial" independent proof of the corpus delicti and the criminal responsibility of Slaton. Slaton was seen going into the house of the victim and coming out just before her dead body was discovered. She had been shot and strangled, and she was found to have Slaton's semen in her vagina. The cause of death was a gunshot wound.
 Issue 15
Slaton argues that the fact that the trial judge's secretary was allowed to dismiss jurors from the venire violated his right to a fair and impartial jury. The secretary dismissed 35 prospective jurors for various reasons. Slaton maintains that the secretary was not authorized to excuse the jurors and that only the trial judge can dismiss jurors for the excuses contained in the statute. Slaton also contends that the trial court failed to comply with the Court of Criminal Appeals' order on remand as to that issue.
Ala. Code 1975, § 12-16-145, provides, in part:
 "Prior to the date on which a prospective juror has been summoned to appear, the presiding circuit judge, or a court official designated by him, shall have the authority to disqualify the prospective juror or to excuse or postpone his service to any future date, notwithstanding the provisions of any other law."
In Windsor v. State, [Ms. 1930048, Feb. 18, 1994] ___ So.2d ___ (Ala. 1994), this Court held that it was not error for the trial judge to delegate to another person the authority to excuse jurors or for that person to excuse potential jurors outside the defendant's presence prior to trial.
In the present case, the judge's secretary was properly designated as having authority to excuse potential jurors, and the trial judge provided her with a catalog of acceptable excuses. Therefore, we conclude that the trial court complied with the Court of Criminal Appeals' order and with the procedures outlined in Windsor v. State. We see no error in the secretary's excusing of potential jurors outside Slaton's presence.
 Issue 16
Slaton claims the instructions to the jury were coercive and censorious and goaded the jurors into reaching a verdict; he says, in effect, the judge gave a "dynamite" charge. In the sentencing phase, the judge gave the jury an instruction describing its deliberative duty. That charge was anAllen[2] charge. Slaton contends that it was coercive and unfairly led to his death sentence.
After the jury began its sentence-stage deliberations and before it returned its sentence recommendation, the jury sent the following question to the trial court:
"What happens if we cannot come up with enough numbers to go either way?"
(R.T. 2311.)
In response to the question, the trial court instructed the jury: *Page 926 
 ". . . I don't want to know what the vote is, that's not any of my business at this point, what your vote is, so don't give me anything concerning the numerical count of your vote. But it is highly desirable and important if there is any way possible, ladies and gentlemen, that you reach a verdict. And of course, it is your duty, sworn duty, to do so if you can. You are urged to make every effort to reach a verdict consistent with your conscience. You should lay aside mere pride or judgment of opinion. You should examine your difference in a spirit of openness, fairness, and candor. Reason together over any differences that you have and harmonize, if possible. Have a proper respect for each other's opinion and listen to each other's opinion.
 "In direct answer to your question, if you cannot agree, if you cannot reach the numbers that are necessary under the law, I think you know what the Court will have to do. I would have to declare a mistrial and the case might have to be tried again as far as the sentencing phase that you are in at this time."
(R.T. 2311-12.)
It is clear from this charge and other statements made in the context of it that there was no coercion placed upon the jury by the trial judge. The judge specifically stated on two occasions that he was not attempting to coerce those jurors in the minority into agreeing with the majority (R.T. 2314-15) and that he was not trying to impress "guilt feelings" on the jury in order to get it to return a verdict.
This Court has held that "a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used." Showers v. State, 407 So.2d 169, 171 (Ala. 1981) (citation omitted). The trial judge urged the jury to "resume deliberations" and to "cultivate a spirit of harmony." The trial judge did not ask the jury what its vote was; he did not suggest which way the verdict should be returned; and he made no threat or coercion to suggest the jury had to return a verdict. The trial court did not violate Slaton's rights in giving this supplemental charge.
 Issue 17
Slaton claims the trial judge's jury instructions regarding the function of mitigating circumstances precluded individualized sentencing and mandated a presumption of death, in violation of his rights. He also argues that the jury instructions regarding aggravating circumstances subverted the unanimity requirement, in violation of his rights. Slaton asserts that the jury instructions regarding mitigating circumstances suggested that he had to show that he did not deserve the death penalty. Slaton also contends that the trial court's charge in the sentencing phase could have misled the jury to believe that aggravating circumstances could be found to exist without a unanimous vote.
Ala. Code 1975, § 13A-5-45(f), provides that the State has the burden of proving beyond a reasonable doubt the existence of an aggravating circumstance in order for a capital defendant to be sentenced to death.
The trial court instructed the jury:
 "The defendant enters into this phase of the trial with the presumption that there were no aggravating circumstances that would warrant a sentence of death. This presumption may be overcome only if the prosecution convinces you beyond a reasonable doubt that one or more of the particular specified aggravating circumstances exists."
(R.T. 2285.)
The trial court also instructed the jury at the sentence-stage:
 "An aggravating circumstance is a circumstance specified by law which indicates or tends to indicate that the defendant should be sentenced to death." *Page 927 
 "A mitigating circumstance is any circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without parole instead of death."
 "If the jury is not convinced beyond a reasonable doubt based upon the evidence that one or more aggravating circumstances exists, then the jury must recommend that the defendant's punishment be life imprisonment without parole regardless of whether there are any mitigating circumstances in the case."
(R.T. 2163, 2165.)
The instructions clearly informed the jury of the function of aggravating and mitigating circumstances, and they clearly did not mandate a presumption that death was the appropriate sentence. The instructions clearly informed the jury that, unless and until the State proved at least one aggravating circumstance beyond a reasonable doubt, the jury could not even consider sentencing Slaton to death. Slaton's claim to the contrary is frivolous.
Slaton also claims that the sentence-stage jury instructions on aggravating circumstances subverted the requirement that the jury unanimously find that an aggravating circumstance exists before it can be weighed in determining the sentence. This claim is incorrect. The record shows otherwise.
 Issue 18
Did the State present irrelevant inflammatory evidence and make improper arguments based on that evidence? Slaton argues that the presentation of certain evidence and the State's arguments based on that evidence violated his constitutional rights because they focused on the victim and her surviving family members. The testimony to which Slaton objects involved the victim's activities and the impact of the killing on the victim's family.
Slaton first claims that there was federal constitutional error in the introduction of the testimony of the victim's daughter and in the argument of counsel. In support of his federal constitutional claim, Slaton relies exclusively on the United States Supreme Court's decisions in Booth v. Maryland,482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and SouthCarolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207,104 L.Ed.2d 876 (1989). Booth held that victim impact evidence was improper for consideration in sentencing in a capital case. In Gathers, the Supreme Court held that the prosecution could not focus on the personal characteristics of the victim during the sentencing stage of a capital case. However, in Payne v.Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720
(1991), the United States Supreme Court expressly overruledBooth and Gathers.
In Payne, the Supreme Court held that victim impact evidence was admissible at the sentencing stage of a capital case. The Supreme Court also held it was proper for the prosecution to refer to the victim's characteristics at the sentencing stage of a capital case. 501 U.S. at 824-25, 111 S.Ct. at 260708.
Slaton also claims there was state law error in the introduction of the testimony of the victim's daughter and in the argument of the prosecutor at the guilt stage of his trial. Slaton relies on Alabama case law holding that evidence of a victim's good character cannot be admitted in a murder trial unless the defendant first presents evidence indicating the victim was of a bad character. There was no evidence of the victim's good character introduced at the guilt stage of Slaton's trial. At the guilt stage, the victim's daughter testified that the mother was "basically" in good health and that she had enjoyed working with crafts and gardening. (R.T. 976.) The daughter also testified that her mother had had throat surgery and had trouble speaking. (R.T. 981-83.) This information was not relevant. However, it was not evidence of good character. Although the admission of this evidence *Page 928 
was error, it was not prejudicial to Slaton's defense and was therefore harmless.
The other case law Slaton cites concerns inflammatory and prejudicial argument by prosecutors. The remark cited by Slaton is one in which the prosecutor briefly stated that he spoke for the victim's family. The remark by the prosecutor was not inflammatory. Darden v. Wainwright, 477 U.S. 168,106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Henderson v. State, 583 So.2d 276, at 286 (Ala.Crim.App. 1990), affirmed, 583 So.2d 305
(Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268,117 L.Ed.2d 496 (1992).
Further, Alabama law permits the presentation of victim impact evidence at the sentence-stage of a capital murder trial, and it permits argument based on that evidence. The Court of Criminal Appeals has ruled that a trial court properly considered "statements from members of the victim's family describing the physical and psychological effects the victim's death had on members of her family." Knotts v. State, [Ms. CR-92-0462, June 16, 1995] ___ So.2d ___ (Ala.Crim.App. 1995);McMillian v. State, 594 So.2d 1253, 1273-74
(Ala.Crim.App. 1991). Slaton's claim that Alabama law prohibits the introduction of victim impact evidence at the sentence stage of a capital murder trial is simply wrong.
There was no irrelevant inflammatory evidence presented, and the prosecutor made no improper inflammatory argument focusing on the victim. The evidence and argument Slaton complains of did not violate his federal constitutional rights or state law rights.
Ala. Code 1975, § 13A-5-53(a), mandates that appellate review of a death sentence include a determination "whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case."
We find in the sentencing proceedings no error adversely affecting Slaton's rights and no violation of his rights. The trial court's findings concerning the aggravating and mitigating circumstances (C.R. 24043) were supported by the evidence.
In determining if death was the proper sentence in this case, this Court must answer three questions set out in Ala. Code 1975, § 13A-5-53(b):
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
As to the first question, we conclude that no passion, prejudice, or other arbitrary factor influenced the imposition of the death penalty. The trial court specifically instructed the jury to avoid such influences (R.T. 2294), and there is simply nothing in the record to indicate that any such factors were present.
The second question is "[w]hether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence." The trial court found one aggravating circumstance — that the capital offense was committed during a rape in the first degree. (C.R. 240.) There was little mitigation. (C.R. 241-42.) Our independent weighing of the aggravating circumstances and the mitigating circumstances indicates that death was the proper sentence in this case.
The third question is whether the death sentence in this case "is excessive or disproportionate to the penalty imposed in similar cases." It is not. See Freeman v. State, 555 So.2d 196
(Ala.Crim.App. 1988), cert. denied, 496 U.S. 912,110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); Bradley v. State, 494 So.2d 750
(Ala.Crim.App. 1985), cert. denied, 480 U.S. 923,107 S.Ct. 1385, 94 L.Ed.2d 699 (1987); Dunkins v. State, 437 So.2d 1349
(Ala.Crim.App. 1983), cert. denied, 465 U.S. 1051,104 S.Ct. 1329, 79 L.Ed.2d 724 (1984); Thompson v. *Page 929 State, 542 So.2d 1286 (Ala.Crim.App. 1988), affirmed,542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208,107 L.Ed.2d 161 (1989); Barbour v. State, 673 So.2d 461
(Ala.Crim.App. 1994).
OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
MADDOX, SHORES, HOUSTON, and INGRAM, JJ., concur.
[2] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154,41 L.Ed. 528 (1896).